Yeah. Okay. What's it doing? I'm about to say, hey, there we go.                  That's good. Oh, I'm sorry. That's good. That's good. Yeah. That's good. That's good. That's good. That's good. That's good. That's good. We won't start your clock running until we... Yeah, we got mechanical adjustments here. Important chair issues going on. It's all fixed. Before you start, why don't we all introduce ourselves? Or, why don't you guys introduce yourselves, just so we know who's... I gather that the counselor at that table must be the representative of the United States. Good morning, Your Honors. Good morning, Your Honors. My name is Wendy Holton. I represent Martin Garcia. Garcia. Okay. Okay. Okay. And you're going to be arguing in which order? I'll be arguing very briefly first. Mr. Hubestall will go second, and he'll take about five minutes. Ms. Lord will take the remainder of the time.       Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. May it please the Court and Counsel, I am here today, even though... even if I prevail on everything that I argue here, my client is still going to do the rest of his life in prison. Just on the remaining gun counts, he will do 660 months or 55 years. But that being said, there are just two things that I want to point out to you today. I am prepared to rely on the briefing in this case. But I do have one error in my briefing, and I do want to make one clarification. The error in my briefing is regarding the first issue, and that is whether Garcia could have been held liable under the Pinkerton theories on counts 4, 5, and 6. I erroneously state, and I actually called my office this morning trying to figure out why I made this mistake, that counsel didn't argue below that count 4 did not apply under the Pinkerton theory. He, in fact, did make that objection at page 786 of the transcript, and that is found at page 33 of my excerpts. So that error was preserved for appeal on count 4. Counts 5 and 6, I did get. Okay. The other point that I would like to make, and this is a clarification, regarding my second issue, the convictions pursuant to the Pinkerton theory on counts 22 and 23, count 23 being a gun count that Garcia received 30 years on, as set forth in the briefing, Judge Siebel, after this case, after Garcia's case was on appeal, found in Codefendant Green's case that Isaac Kimber, who was the subject of those two counts, was no longer a member of the conspiracy, and, therefore, nobody else could be convicted of those counts on a Pinkerton theory. So what do we do with that? Do we, is it sentencing disparity, or? Well, I argue that the protection argument came up in the reply brief. It was a little late, but what about sentencing disparity? Is there any traction in there? I believe that there is, yes. On what basis? I mean, if the, is the judge judicially estopped from making inconsistent rulings against codefendants? Well, you know, I actually, and that's my point here, is I could not think of the word for what happened, and I now have the correct words for the arguments I was making, and that is collateral estoppel. Collateral estoppel against the court. Now, there's an interest. Mr. Carpenter, Garcia's counsel below, made the precise argument that prevailed in Green's case, and he reiterates that argument in this appeal. So this, but the government now says, well, Judge Siebel erred, but they did not appeal. What if we decided, though, in looking at Mr. Smith's record, that Judge Siebel was wrong, that there is evidence in the record to sustain a conclusion that the counts were in furtherance of the conspiracy, that Santiago continued to operate the drug distribution enterprise from the Yellowstone County Jail, and that Mr. Smith was dutifully collecting debts that were owed the organization and continuing to distribute methamphetamine for it. Could we then look at what Judge Siebel did with regard to Mr. Garcia and say, Judge Siebel was correct in denying Mr. Garcia's motion. The record clearly supports the district court's decision. He was wrong with regard to Mr. Smith, but Mr. Smith is a lucky man. You know, he wins the lottery today, and that really does leave you, I think, with Judge Fischer's suggestion that if there's any error here, it has to be in sentencing disparity and not with regard to some sort of notions of estoppel, which I find curious. I mean, you may be right. Maybe that is the right word. Well, when I finally saw those words and I thought, yes, that's right, and I did then do just a little bit of research, and it did seem to apply. I believe that there is sentencing disparity here. I would also argue that Judge Siebel's ruling is the law of the case and that the government is then collaterally estopped from arguing anything about it. Let me help you with another analogy. Let's try this one. We sometimes hear arguments with regard to inconsistent jury verdicts. And had Judge Siebel been sitting in a bench trial and made findings of fact and ruled that Mr. Smith was not liable, but Mr. Garcia was, would we also have to remand because of the inconsistency in the verdicts that were rendered? I believe you would, because the point here is that the judge determined that Isaac Kimber, who was the named defendant in those two counts, was no longer a member of the conspiracy. Therefore, it doesn't matter who else was. I mean, even if the argument could be made that Garcia was still part and parcel of this conspiracy, if Isaac Kimber is not a member of this conspiracy, Garcia can't be held responsible under Pinkerton. So is your argument there are really multiple conspiracies going on here and that this wasn't the conspiracy that the grand jury charged? No. My argument is, is that Judge Siebel's finding is that Isaac Kimber was no longer a member of the conspiracy. So it was a different conspiracy, a conspiracy between Mr. Kimber and Mr. Santiago, but it wasn't in furtherance of the conspiracy that the grand jury charged. Mr. Garcia and Mr. Smith. Yes. Isaac Kimber's actions were not in furtherance of that conspiracy. That's correct. So we got all kinds of conspiracies going on here, but not the one that your client should be tagged for. Correct. And that's unless the Court has any further questions, that's all I have. Thank you. Thank you. But your basic argument is, on that point, is that there was insufficient evidence. Pardon? Yes. Your basic argument is that there was insufficient evidence, whether or not Judge Siebel did anything else in another defendant's case. I mean, that bolsters your argument for insufficient evidence, but ultimately your argument does not have enough evidence that Kimber was still part of the conspiracy. If you win on that, that's the end of the case. That's correct. With no word about consistency or anything else. Yes. Thank you. Okay. Thank you. We'll next hear Mr. Sonicson. Oh, no. I'm sorry. I'm looking at the wrong page here. Mr. Hubestall. Yes, Your Honor. Palmer Hubestall, again, on behalf of Ronald Smith. And the issue that I have is the contention that this Court heard when it did not consider diminished mental capacity as a basis, well, as a mitigating factor when deciding whether to sentence Mr. Smith below the sentencing guideline range. What do we do with the Court's statement that even if he considered it, he wouldn't have departed down the road, even if he could properly consider it? It seemed to me that the Court was, when he made that statement, was saying that under 5K2.13, if he considered it, he would not do it under 5K2.13. Well, why shouldn't we read that to be, even if I had the authority, I wouldn't do it? Well, what we're talking about is 3553 and a mitigating factor under 3553.  I mean, is the analysis any different? Can I read the import of the judge's statement the same? Yes, because it seemed to me that the judge's statement, even if I could, I wouldn't because it's prohibited by the fact that his diminished mental capacity is a result of drug use. Well, he said more than that. I mean, he basically said, look, if every drug dealer who is also addicted to drugs could use that as a defense, and then he cites the percentage of defendants who have come before him in the six and a half years that he's been on the bench, then no one would ever go to jail for drug dealing. Well, we're not really using that as a defense. We're using that as a mitigating factor under the volitional aspect of the diminished mental capacity. I don't see how that's any different. I mean, the Court is essentially saying, if this is an excusing or mitigating factor, then nobody would be convicted of these crimes. Well, the fact is, well, again, it's not a matter of conviction. It's a matter of sentencing. And anybody, if we look at the ---- Why wouldn't it go to the mental element of intent to distribute? Isn't your argument that if he's diminished in his responsibility, then he can't form the intent, and therefore, he shouldn't be punished for it? No. The argument is under 5K2.13, and if we look at the Thompson case which cites the McBroom case, there are two aspects of diminished mental capacity. The first one is a cognitive impairment, and the second one is a volitional impairment. And with respect to the volitional impairment aspect, this defendant might know that as he is committing this conduct, it's wrong, and that he shouldn't be doing  it, but nevertheless, his addiction, and it's by virtue of his addiction, that he cannot control his conduct. And that's a matter of the mind, because the mind is a ---- So your argument would be you can still be convicted of it, but you shouldn't be punished as severely for doing it because you couldn't help yourself. That's definitely something that a district court should be able to consider under 3553. This is a post-Booker argument, right? Right. This argument would not have existed prior to Booker. Right. It would not have had any traction prior to Booker. But now that Booker has opened up the gates, so to speak, to the variety of 3553A factors, your argument that should be considered, and it looks like Judge Seaborg doesn't get it. Right. That's exactly the point. And now we're going to tell him about it and send it back and trust him to do it right, huh? That's exactly right. I think that the court ---- Even though he said ---- Pardon me? Even though he said, even if I were to take into account, why wouldn't he ---- In other words, I think that was Judge Tolan's initial question. Wouldn't Judge Seaborg say, I've already answered that question? Well, again, I ---- I figured I ---- even if I could take it into account, it wouldn't make any difference. I don't buy it. I think that what the court was saying at that point was that one of the prohibiting factors of a diminished mental capacity departure under the guidelines is that it is the result of drug use. And here, because we're proceeding under 3553, it doesn't matter if it's the result of drug use. If the guy has a diminished mental capacity and if he has a volitional impairment, whether it's a matter of pornography addiction, as in the Thompson case, or gambling addiction, as in another case, the fact of the matter is that it's an addiction that prevents this man from controlling his behavior. And that's a mitigating factor that when a court considers characteristics under the ---- of the defendant under 3553, it should be able to do that. But you want from us a remand that essentially tells Judge Siebel that he has to reduce the sentence for that reason. No. Well, then let's go back to the question I started with. If that's your position and we send it back to Judge Siebel and he says, I told you the last time that I was here that if I could consider this, I wouldn't give him any credit for it or go any lower, what have we accomplished? Well, this is what we accomplished. He says that I have not found a case under 3553 where I can consider drug use or drug addiction as a basis or as a mitigating factor, rather. Yeah. All right. And that's true, right? And you want this to be the case. This is the case. Right. Okay. And so we send it back and we say, Judge Siebel, you can consider it. And then Judge Siebel says, well, I said the last time around that if I could consider it, I wouldn't depart any lower. So I just am not sure I understand the point of this whole exercise. Well, again, I think in the transcript we'll identify that the reason he didn't consider it, the reason he said I wouldn't do it in any event, he was proceeding under a 5K2.13 analysis. Well, I guess it really comes down to how you and I read what he said. And you may have a better feel because you were there. But just looking at the words, it appears to me that what he said was, if I could, I would not. That's how I read it. Because it's precluded by drug addiction. I don't read that part of it. I read, I just. I don't see what he says, if I could, I wouldn't. You're conceding quite a bit there. I'm not sure I could find it in the transcript. You're looking at page 81 of the bait stamp, page 81, I think this is what you're looking at. In fact, I don't think I find could within five of would have. Maybe you should save that for a bottle when you have a chance to look at it. Green. Take a look at page 80, Mr. Hoekstal. Excerpt of record page 80. At lines 20 and 21. Good morning. June Lord for Robert Green. Robert Green has a different issue in that he is truly has diminished capacity. It's not caused by drugs. He has been evaluated. He's considered to have considerably diminished capacity. And the problem with this case is he's liable for this gun count. This is the main issue based on foreseeability. And our argument is that a person without sufficient mental capacity could not be able to reasonably foresee that one of the people would have a gun. That's just as a matter of ultimate fact that applies across the board in all cases. That seemed to be what the psychologist said, that if foreseeability requires average intelligence, so anybody below average intelligence, ipso facto, can't reasonably foresee the consequences on a broader scale. That's correct. And that's the argument you're making here. Well, but there's some other factors. Is that the argument you're making here? Yes. Okay. But there are some other factors in that he didn't know about this gun. And, as you see, the jury acquitted Mr. Green of many, many of these counts. He just wasn't around. His main involvement was he talked about this back in Seattle when they, or Washington, when they started this drug transportation. He rode back and forth with them several times. There's no indication he ever made a drug transaction until after Santiago was arrested and Santiago started telling him to go do these things. Refresh my memory. Was Green in the car when they made the trip to Missoula where the gun was transported? No. Not by my evidence. Okay. He was in the car when they made the trip in October when they were busted in Billings. Right. And the gun was found, the guns were found in the room occupied by Gwen Black and Santiago. Green wasn't even around. Apparently he rode over with them, but he left immediately. Green was more into chasing the girls, I think, than dealing drugs. Okay. And, but when he was given specific instruction, and we're not arguing against that, but when he was given specific instruction to help collect these debts and get some more drugs and sell them to get Santiago out of jail, we're not arguing that didn't happen, that he shouldn't have been convicted on that. But the big conspiracy, I don't think he had the mental capacity to form the intent, but that wasn't brought up before trial because I didn't know this man was this incapacitated. He covers that really well, and the psychologist also testified to that fact. Well, I mean, he might have an IAC claim, but I don't see where we can consider that here. It hasn't been raised. I'm sorry, I didn't. In effect, it was his counsel claim. He might have one of those. Yeah. If you think his lawyer should have recognized his lack of mental capacity and didn't. Well. Maybe he has that kind of claim, and he can raise it on collateral review. But this, you know, if every time somebody turns out to be a dumb criminal, he gets a new trial, you know, we have a lot of new trials. The smart ones don't get caught. I was a trial lawyer, and I did not recognize it, but the reality in Montana, our clients are housed in Shelby, Billings, Missoula. We don't. I'm not saying you're ineffective. I'm just saying maybe he has that kind of claim, but this is hardly the kind of thing that's a newly discovered fact that couldn't have been found before. I mean, it doesn't cover it at all. He just covered it really well. Thank you. Why don't we save this time we've got left on your clock for about a moment. We'll hear from the government. Good morning, Your Honors. Previously, I introduced myself as Jessica Fair from the District of Montana, on behalf of the government in this case. I'd like to first start with Garcia, who Ms. Holton discussed first. Now, the issue is not whether or not Mr. Garcia will remain in jail for the rest of his life, regardless of what this Court does. The issue in that case is whether or not we're going to treat Judge Siebel's ruling with regard to Green as some sort of estoppel with respect to Mr. Garcia. Well, why don't you just argue subjective evidence? Why wasn't Judge Siebel right when he ruled, as he did in Green's case? As we pointed out in our brief, Judge Kaczynski — I'm sorry? As we pointed out in our brief, we believe there's a laundry list of facts that the jury heard that do point to the involvement of Kimber. First of all, Kimber was a regular dealer for the group. This is cited in the SER, page 69. I mean, the fact is you persuaded the judge of a wrong proposition of law, right? So you and the judge labored under misapprehension as to the law, and that is that the defendant could be held responsible for acts in a conspiracy that happened before he, the defendant, joined. Well, the comments made by trial counsel weren't an artful, Your Honor, and did state a misapplication of the law. The facts still— Well, a simple yes will not only—because you just said amounts to a yes, but it makes it sound so much more candid. It saves time. You know, it avoids sort of that weaselly lawyer's talk. Okay? You gain nothing at all, and you only lose ground in time with respect to the courts by giving an answer like you just did. The fact is the government persuaded the judge of an incorrect proposition of law. Yes, Your Honor. Okay. You, or the government's lawyer, was under a mistaken impression. The judge was under a mistaken impression. So whatever findings you say or whatever evidence you think that might have been supported was not filtered through a judge who understood his duty under the law. This is all backfilling on a hypothetical set of findings that the judge didn't make because he was confused about the law, being confused by the government. Isn't that a fact? Yes, Your Honor, but if I may explain the government— Why isn't this exactly the kind of situation where no deference is due at all? None whatsoever. And the fact that next time the judge gets the same issue and has had the fog lifted of the incorrect, the misapprehension of the law, he says no. He comes out the other way factually. I mean, this is the kind of situation where it behooves the government to do the decent thing and say, we goofed. But go ahead. Keep talking. Thank you, Your Honor. In this case, the record that the jury heard, that the jury convicted on, was the evidence that is listed in our briefing that I can discuss if the Court would like. The ultimate finder fact, the jury in this case, did find that under counts 22 and 23— Yeah, but why did Judge Siebel come to inconsistent positions then? We believe that— On the same evidence, apparently. We believe that Judge Siebel made an error. But you didn't appeal that. That's correct, Your Honor. So why aren't you a stop? How can you get inconsistent—how can the government get inconsistent rulings in the same trial before the same judge and not appeal what you are now claiming was error and then ask us to review the evidence de novo, basically, and make our own independent finding that, collaterally, he was wrong, therefore it's okay for what he did with Garcia? I find that troublesome. The United States government looks at Green and Mr. Garcia as two separate defendants with separate facts that tie them to the conspiracy in their mind. What were the different facts between the two of them vis-à-vis Kimber's involvement? Wasn't that his activity? It was all turning on third party. Wasn't it whether or not Kimber was still involved? Yes, Your Honor. Okay. So what is the difference, whether you're looking at it from Green or Garcia's perspective in that respect? Your Honor, the United States, in reviewing both the claims against Green and Garcia, looked at who was the kingfish, who was the main supplier and the organizer of this conspiracy. Was that got to do with Kimber's involvement? I thought this was all turning on whether or not he was still involved. That's correct, Your Honor. And the evidence does point to the fact that Green and Kimber were still involved while Santiago was in jail. Garcia was the supplier of the drugs to Green and to Kimber. Now, the reason that the government didn't appeal, although I was not trial counsel, Your Honor, I am aware that at this time it's rather difficult for the United States to receive permission to appeal and we didn't. That's the institutional problem. Right. The fact is the judge made a fact finding on identical facts, right, as to the continuing involvement of Kimber, right? That's correct. It had nothing to do with the status of either Garcia or Green in that aspect. It's really whether or not this guy was still involved. Isn't that right? That's correct, Your Honor. Okay. So you lose on that factual determination and what you are now coming up and saying, well, if you look at what those facts regarding his involvement are, really, Judge Kaczynski is interpreting those facts vis-à-vis Green, so it's okay for his earlier determination made, as Judge Kaczynski points out, under an erroneous understanding of conspiracy in Pinkerton law, but in any event, that that's okay. You can have two defendants in the same trial sentenced differently on the same facts by the same judge. I, you know, that's sort of, it's only an accident of sequence. Now, either somebody's got, somebody's gotten a windfall here. The big issue that was discussed earlier was sentencing disparity and whether or not – Well, that's just a label to put on it, but that's what it is as a practical matter. When you look at the involvement of the two separate defendants and you look at the evidence that was presented in the record to the jury, the fact-finders, and they determined that he was, in fact, responsible for the drugs and the guns in the larger conspiracy that Mr. Kimber was arrested with on December 9th. Now, as far as the sentencing disparity, when you look at the overall convictions as to all of the members involved in this conspiracy and the counts they were convicted on, it's clear that the jury believed that Mr. Garcia was the organizer leader of this group, did have control over all the members, and was actively involved. Now, regarding the issue of collateral assault – So you said the jury was? Yes. Did you say the jury? Yes, Your Honor. Well, why did the jury have to decide that? The jury had to convict regarding the Pinkerton counts, Your Honor, with regard to both Mr. Garcia and Mr. Green. Why would they have to determine that he was the leader? In all of the evidence presented, Your Honor, the definition or the actual decision that he was a leader regarding the enhancement was not decided by the jury. You're correct. But the overall scheme and the picture painted at trial – Well, I asked you a specific question. You made the statement about his being a leader, and I asked you if the jury made that determination. You said yes to me. No, Your Honor. The jury did not make the actual leader enhancement decision. So what does that have to do with the analysis of the evidence that the jury presented? What does that have to do with anything? In finding Mr. Garcia liable under the Pinkerton counts, the jury made a determination that he was involved and that those acts were not only in furtherance of the larger conspiracy, but that he was involved in that conspiracy. And that's what their conditions on those counts demonstrate. But your theory, as I understand it, is based on the fact that he was the source of supply for the drugs that Santiago distributed through Green, Kimber, Bertus, Black, all these people, right? That's correct, Your Honor. Okay. Can you help me then with regard to the evidence that ties Garcia to the conspiracy in the early part? I'm going basically to counts four, five, and six, because as I read the record, it suggested that the drugs were actually coming from Alex, last name unknown, from Sidra Woolley and not from Garcia in Mount Vernon. Did I misread the evidence? No, Your Honor. And the explanation of that evidence has to be taken with a couple facts in mind. Mr. Kimber and Mr. Santiago refused to testify when called at trial. So the case that the government was prepared to plan, although not an excuse, did change significantly during the course of trial. So it's a circumstantial case. Correct, Your Honor. In that respect. Correct. Okay. What is your circumstantial evidence to show that Garcia supplied the drugs or Garcia was tied to Alex? Help me out here. What's the record show? At the very beginning, we have Black and Santiago, who are living in Sidra Woolley, Washington, who are friends with Garcia. Garcia at that time is supplying both Black and Santiago with cocaine. That's in the record at SCR 42. Then we have discussion of the evidence. I'm sorry, SCR what? 42, Your Honor. Then we look to the first drug. So he's supplying drugs to whom? To Black and Santiago. Black and Santiago are then dealing those drugs out of Mr. Green's residence in Washington with Mr. Green's knowledge. We then have the first trip to Montana, which occurred sometime, and again, that's another issue that we realize exists in the record, that there is no specific dates mentioned. It's not ---- You say SCR 42. This is the government's? Yes, Your Honor. There's no direct evidence that it occurred on May 15th, May 16th, May 17th, because we have a large group of individuals moving a lot of drugs, using a lot of drugs, and they're not keeping calendars to record those dates. So you're saying that even though the, notwithstanding the lack of specific dates, that the jury could infer from the prior relationship between Garcia, Santiago, Black, and Green that started sometime in early 2003 when they were distributing drugs for him in the Mount Vernon, Cedro, Woolley, Washington area, that that's when the conspiracy began? That is correct, Your Honor. And that was the government's theory at trial? Yes, Your Honor. Was that evidence of earlier drug dealing, meth, or was it cocaine? It was primarily cocaine. Well, where's the evidence it was meth? It has to be meth, doesn't it? Garcia, 42, deals with cocaine. That's correct, Your Honor. Yes, you didn't say. So what was the conspiracy charged in the indictment? It was methamphetamine. Not cocaine? No. But, Your Honor, what we have is we have this initial drug dealing happening in April of 2003. As this process moved on, as the dealers became more comfortable with each other and distributors, we then moved to May of 2003 when we had the first trip to Montana with the methamphetamine with Mr. Santiago and Mr. Green and some of their other compatriots. At that point, they're getting methamphetamine, and at trial, no one testified as to who provided that methamphetamine. However, there was reasonable evidence based on that testimony that they were prior drug dealers with regard to cocaine and personal use by Ms. Black of methamphetamine provided by Garcia while she was in Washington, along with the evidence that ---- Yes, Your Honor. Okay. Any indication that he supplied commercial quantities? Not until either mid to late July, according to the governments and the evidence. Now, in the indictment it charged on or about July. Here's the problem with that. I mean, you've got a judge who's out at sea because you're calling Ms. Lannan. Okay. So he is processing this evidence that comes in, and he's making rulings under a mistaken understanding of what the law is. He doesn't think it matters whether or not Garcia is agreeing. Garcia? Garcia is providing the drugs. But he thinks it doesn't matter because he's persuaded that if the stuff occurred prior to joining conspiracy, it comes in. So the filter, the guy we rely on to make sure that the evidence comes in only if it's relevant and that the case stays before the jury, only the burden is met. The guy who's actually on the ground is completely at sea because you guys cut him loose. You don't have anything at all showing distribution before that, in 2003, right? That's not correct, Your Honor. Okay. What do you have? I mean, you've got this cocaine thing here. We have trips that occurred in July, early July. July 4th is one of the dates that Ms. Black testified she was certain about. She returns to Washington and then to Montana with cocaine. And I acknowledge that that is cocaine and not the methamphetamine charge. However — So why are you talking about it? Because, Your Honor, it shows a pattern of distribution in general. And then we look to SCR 110 in the government's record, where Ms. Black testified that drug distribution occurred in July, August, September, and into October within the conspiracy. Okay. And who does she mention? Okay. I'm at 110. Go ahead. Where are you looking at? That was SCR 110, Your Honor. Yeah, I got it. What page? What line? Towards the bottom of the page, Your Honor. They have numbers on the left-hand side. I know, Your Honor, and I apologize. I don't have them in my notes. If you wait one moment. I have nothing but moments. Your Honor, I believe it is line 7 through line 24 is the discussion. Also — Why don't you read the key part, the part that really helps you? 7 to 24 is 17 lines. Did you, Eddie — how did you and Eddie — Why don't you start with the line number? Line 18, Your Honor. Okay. Did you and Eddie — how did you and Eddie — Eddie who? Eddie. That's Mr. Santiago, Your Honor. Santiago, right. Actually give the dope out? Did you deliver it? Take it to the people? Did you people — did people come to you? Answer from Ms. Black. Either we would go to their houses or they would come to where we were. Question. And that occurred in July, August, September, into October. Yeah. We have the larger distribution happening in that period. If we look to — Where does it say where they got this? This is all part of the circumstantial evidence, Your Honor, that was presented at trial that, when weaved together by the jury, shows and can be inferred that Mr. Santiago was getting the narcotics from Mr. Garcia and that that was — But where does the — from Mr. Garcia part come in? If you look at SCR-157 — I mean, 110 provides no help whatsoever. I mean — I'm sorry, Your Honor? 110 provides you no help whatsoever because all it says is that Santiago and Black were engaged in distributing methamphetamine. It doesn't tell anything at all about where they got it. Okay? I'm now at 157. Yes, Your Honor. Okay. Let's look at those lines. This is the testimony of Mr. Nate Miller, who was a distributor and early supplier of Mr. Santiago. Okay. And what line are you reading from now? If you look to line 12, Your Honor. Okay. The issue presented at trial was that at some point early in Mr. Santiago's arrival in Billings, Montana, he was buying methamphetamine from other individuals, as well as bringing in his own from an unknown supplier from Washington. Mr. Miller testified that early in his arrival, and if we'll remember also from previous testimony, this is June of 2003, Mr. Miller testified that he became a provider in line 16. Who is he? He's discussing Mr. Santiago, Your Honor. The prior testimony on that page, starting at line 7, is how often did Mr. Miller supply quantities to Mr. Santiago. He said he did it occasionally. Now, we move down in the testimony, and he says at that point, somewhere in the middle of 2003, with which the previous testimony that outlined that would have been May, June 2003, Mr. Santiago stopped buying from Miller. Why? Because he became the man who had everything. He had another supplier. Yes, Your Honor. Still don't have Garcia. You're still looking now for the link that makes us say that that other source was Garcia. Correct, Your Honor. And if we look to Gwen Black's testimony, again, SCR 110, and the prior testimony regarding distribution. So far we've got that Garcia fronted personal use drugs, cocaine, and some meth. Correct. Within the relevant time period, excuse me, with cocaine, we have to infer from that that Garcia had access to meth. Is that right? No, Your Honor. We actually have testimony from Gwen Black, as previously discussed, that he actually gave her meth. Yes, Your Honor. Okay. But it was personal use. So what that establishes is that Garcia had enough meth to give Black enough for personal use. And that's all it takes, then, to say he is – there's enough evidence to say he is Santiago's source for much greater quantity. Yes, Your Honor. Is there anything else? Yes, Your Honor. There's a lot of circumstantial testimony, and that was the issue at trial. Because Mr. Santiago – Now, whenever you say circumstantial, you know, you've sort of lost credibility of that word with me. It means you haven't got anything. You've got nothing that connects green. Garcia, I'm sorry. Well, what about the – I'm looking at paragraphs 7 and 10 of the indictment, which talk about actual deliveries of pound and pound-and-a-half quantities of methamphetamine from Garcia to Montana. Who testified to support those allegations? That was both Gwen Black and Aaron Zindler. But those were – the dates of those were definite, August, September, October. So the jury was then asked to make the inferential leaf that if Garcia was supplying commercial quantities of methamphetamine later in the summer and fall of 2003, and that Santiago had a source of supply in Washington earlier in the April, May, June timeframe, that that source of supply must have been Garcia. That's correct. And that's based not only on the personal use of Gwen Black, but also on when Gwen Black wanted drugs in late June, July, to supply to Santiago. Who did she call? She called Garcia, and she called him because she knew he could provide commercial gray and pounds as needed for the big distribution ring that they were planning in Montana. So the – all of the evidence, when pulled together, did give the jury an appropriate amount of information with which to infer that Garcia was the supplier at some point on or about July. Okay, just to be clear, though, Black never said that Garcia, with the access to the sufficient quantity, specified that that was meth. She never said, I could go to him in these June, July periods for meth. She used his meth on a personal use level. I know. You've pointed us to that statement, that she got personal quantities. She got cocaine, and she also got some, also then moved to meth. You're asking us to infer that when then she said, when I needed to supply Santiago, I went to Garcia because he had the capacity to give me drugs. She didn't say he had the meth. We have to infer that meth would be some of what? No, Your Honor. When she actually contacted him at that time, it was for methamphetamine. Okay. When did she contact him? That's the issue, Your Honor, is the testimony is vague as to the actual date. We know that, based on all of the testimony, this occurred sometime mid to late July. Let me send. Okay. Are there any questions regarding the other defendants, Your Honor? I don't have any. Thank you very much. Well, yeah, I'd like to see if you agree on Smith that the district court had made a ruling that under 3553, even if he could consider drug addiction on a volitional basis, he would not change his mind. I agree, Your Honor. And do you have the record cite for that? I do, Your Honor. It is Smith's excerpts of records, page 80, line 8 through 21. Collins keeps talking at that point. That's correct, Your Honor. He keeps talking. Yes. It's not like he says, well, even if I could, I wouldn't do it. I think he keeps talking. However, at that point, later in the sentencing, which would be Smith's excerpts of records, 82 through page 86, Judge Siebel does walk through the typical 3553A analysis of the characteristics of the defendant and the crime. But where does he say, specifically, if I could? You say that's on page 81? Page 80, Your Honor. Oh, page 8. Lines 8 through 21. And he states, even if it applied, I wouldn't apply it in my discretion. But then he goes on to say, this is precluded because the defendant's administrative capacity must not have been caused by voluntary use of drugs or other intoxicants. He just doesn't understand the argument. That's correct, Your Honor. I think there was some confusion regarding. Well, is that it? Or is he referring back to 5K2.13, which is a correct interpretation of 5K2.13? I believe you're right, Judge Tallman, that he was referring back to the 5K.21 discussion because that's what he believed Mr. Huvestal was arguing. Well, if you read that, then that's not a correct. Then that statement, even if he could, I wouldn't apply it in my discretion, doesn't then apply to his 3553 argument. The 3553A argument, which he discusses in 81, he makes no such statement with respect to that. That's correct, Your Honor. But I believe that the discussion of the judge at that point regarding his experience with drug addicts and drug distributors is a broader discussion of why under 3553A this does not apply to Mr. Smith. But he doesn't make a statement like that as to 3553A. You can see that. If I could, I wouldn't. Right. He does not make that statement. Not specifically linking it to 3553A, Your Honor. Your argument is that you have to read the whole thing and conclude from reading the entire text of what he said that the same thinking applied because he talked about the problem of addicts later. It's like a Picasso. You may have to see it. If you just focus on the one corner, you don't get the full picture. That's what we have here. Yes, Your Honor. Okay. I understand. Okay. We'll hear. Thank you. We'll hear. It's a better analogy with the nude descending the staircase. That's the Picasso I was thinking of. That's not Picasso. Not Picasso. Who is that? Matisse? Not Picasso. Your Honor, regarding counts 4, 5, and 6, I believe that the record is very clear that Mr. Garcia, under the evidence given in this case, could not have been a part of this conspiracy until at least August. But why couldn't – I agree it's thin. And the way that the conspiracy was charged, if they charged distribution of controlled substances and not specified methamphetamine, I think it would be an easier argument for Ms. Lair to maintain. But why can't the jury look at the substantial quantities that he was supplying later in the summer and then, based on the testimony of Ms. Black, that she was obtaining methamphetamine from Garcia earlier, interpolate backwards, if you will, and conclude that he was the source of supply for methamphetamine earlier in the summer? Well, if you look at her testimony, and I cite it verbatim in pages 2 and 3 of my gray brief, she talks about before this meth conspiracy really got going, that she was going back to Washington, and she stayed in Washington until at least August. And then she comes back to Montana, and Eddie's trying to get this business going, but it's not going very well. And so this is in August, and they say, so did you help him get his drug business going again? Yes. What did you do? I called Martin and asked him if there was any way I could get crystal meth from him. And so she doesn't put him supplying to this conspiracy until at least the time that she comes back in August. And I would also point out that you I couldn't want to infer, though, that if she knew she could call him, what date in August was that? Is it precise? It's not precise. Just say August, okay? Yes. Just say it's August 30th, the end of August, okay? She knows she can call him and get crystal meth. Isn't it reasonable for the jury to infer that since he had been active in supplying her other drugs, going back to at least what February or May, that it wasn't unreasonable for the jury to infer that he didn't just suddenly come into possession of quantities of meth in August, that he could reasonably be found to have had it in July as well? Well, even assuming that he had access to quantity before then, he wasn't part of this conspiracy. This conspiracy, okay. Right. And, Your Honor, on page one of my gray brief, the government admits that he was not part of this conspiracy until that time. It's the argument that Judge Kuczynski has been referring to regarding the erroneous Pinkerton assumptions in this case. Thank you. Okay. Very briefly, this is, I guess, the third time we've looked at this language, but clearly on page 80 of the excerpts of record, the district judge is talking about a 5K2.13 analysis. What does it mean, though, if I, and even if I could, I wouldn't apply it in my discretion. Discretion says he can look at it, take it into account. So why wouldn't that inform his analysis under 3553 as well? Well, because I think that the evidence, and it's on page 19 of the excerpts of record, clearly states that Mr. Smith is an, or maybe, it says, an individual with chronic psychological maladjustment. Then he goes on to say that, that is, Judge Sewell goes on to say that Mr. Smith is an intelligent, smart individual. What we're talking about here is a psychological problem that causes this individual not to be able to conform his conduct to what we require here in society. And under a 3553 analysis, the district court has to make that. It wasn't a focused 3553 analysis, in other words. Pardon me? It wasn't a focused 3553 analysis. That's exactly right. All right. I don't think you can do much better than what the government conceded, so I'll leave that sitting down. With respect to the court's, Judge Tolman's, concern about opening the floodgates of litigation, I guess, with respect to this defense, I'd point the court to the language of the McBroom case, Third Circuit, 124F3rd at 549, when they state that we believe that this decision will not open the floodgates. I don't know that it's a floodgates decision. It's the problem with the exercise of discretion post-Booker. As I see it, there's nothing in the law that would prohibit a sentencing judge from saying, okay, Mr. Hubestall, I hear your argument on behalf of your client, but I just, in the exercise of my discretion, don't choose to go any lower than I'm otherwise going because of it. And I don't know how that would be an unreasonable sentence post-Booker. Possibly, as a matter of fact, it would be a clear error analysis that the court would have to undertake on appeal. So you really do want more than district judges, you have the discretion to consider this. Do you want a directive that it has to reduce it, it has to result in a lower sentence? Not in this case, I don't. In this case, I don't think it's appropriate for the court of appeals to make a decision based upon the record, although arguably the district court, since it didn't have any testimony upon which to base this decision, it had a report. In other words, it has the same sort of record that the court of appeals considers. No witness testimony that you can... So is that what you really want? You want a remand for resentencing so that you can call an expert like Ms. Lord did? Is that what you really want here? You want an expanded, another shot at sentencing to see if you can develop this diminished mental capacity argument better? Well, I hadn't thought of it, but I certainly could do that. Well, I don't normally give free legal advice, but you might think about it. Maybe you'll get that opportunity, maybe you won't. What I appealed and what I asked the court to do was to remand with instructions to the district court that it can, in fact, do a 3553 analysis. But I don't – but that's not going to get you where you want to go, because that still permits Judge Stiebel to say, I know I have the discretion now to do it and I choose not to. You want more than that? We'd like more than that. We'd like more, yeah. Yeah. Okay. Okay. Thank you. Agents, how are you? We'll start in a minute. We are now adjourned.
judges: Kozinski, Fisher, Tallman